_____

SO ORDERED,

*[signature]*

**Judge Neil P. Olack**
United States Bankruptcy Judge
Date Signed: November 23, 2015

The Order of the Court is set forth below. The docket reflects the date entered.
_____

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

R. DAVID SANDERS,                                         CASE NO. 14-02271-NPO

DEBTOR.                                                          CHAPTER 11

**ORDER APPROVING DISCLOSURE
STATEMENT SUBJECT TO AMENDMENTS**

This matter came before the Court for hearing on November 10, 2015 (the "November Hearing") on the Disclosure Statement (the "Disclosure Statement") (Dkt. 125) filed by the debtor, R. David Sanders (the "Debtor"); the Objection to Disclosure Statement (the "Objection") (Dkt. 132) filed by Trustmark National Bank ("Trustmark"); the United States Trustee's Objection to Debtor's Disclosure Statement (the "UST Objection") (Dkt. 133) filed by Henry G. Hobbs, Jr., Acting United States Trustee for Region 5 (the "UST"); the Addendum to Disclosure Statement (the "Addendum") (Dkt. 157) filed by the Debtor; and the Objection to Addendum to Disclosure Statement (the "Objection to Addendum") (Dkt. 185) filed by Trustmark in the above-referenced chapter 11 bankruptcy case (the "Bankruptcy Case"). At the November Hearing, Craig M. Geno ("Geno") appeared on behalf of the Debtor, Andrew R. Wilson appeared on behalf of Trustmark, and Christopher James Steiskal, Sr. appeared on behalf

of the UST. At the conclusion of the November Hearing, the Court approved the Disclosure Statement under 11 U.S.C. § 1125(a),[1] subject to certain modifications to be made by the Debtor pursuant to the Court's ruling. This Order memorializes and supplements the Court's oral findings of fact and conclusions of law.[2]

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L). Notice of the November Hearing was proper under the circumstances.

## Facts

1. The Debtor filed an individual petition for relief under chapter 11 of the Bankruptcy Code on July 18, 2014. (Dkt. 1).

2. Trustmark is the Debtor's largest secured and unsecured creditor. Trustmark purportedly holds a $411,279.26 claim secured by 67 acres and a cabin in Utica, Mississippi, and a $10,325,350.50 unsecured claim arising from the Debtor's personal guaranties of loans to Sandmark Bay, LLC ("Sandmark") and Sanders Commercial Properties, LLC ("SCP"). (Obj. to Add. ¶ 7). The loans to SCP are secured by commercial properties (two strip malls) owned by SCP in Flowood and Richland, Mississippi. The Debtor has an ownership interest in Sandmark and SCP.

3. On March 13, 2015, the Debtor filed the Disclosure Statement and a plan of

---

[1] Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

[2] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

reorganization (the "Plan") (Dkt. 126). The Plan would be funded through rental income from the two strip malls and "royalties from oil and gas leases in Copiah County, Mississippi." (Plan at 5). "It is critical to the Debtor's bankruptcy case and the Debtor's future, that the Debtor achieve success with the Debtor's royalty rights to oil and gas leases in property in Copiah County." (Discl. Stat. at 12). In the Disclosure Statement, the Debtor suggests that the oil and gas leases could yield an income stream in excess of $20,000.00 per month and the same amount per month for his wife. (*Id.*).

4. On April 17, 2015, Trustmark filed the Objection, arguing that the Disclosure Statement should not be approved because the "Plan is patently unconfirmable" and the "Disclosure Statement lacks adequate information." (Obj. at 1, 3). As to the confirmability of the Plan, Trustmark asserts that the Plan's success hinges "on a hope and a prayer" that the Debtor will strike oil and/or gas. (Obj. at 2).

5. On April 20, 2015, the UST filed the UST Objection in which he contends that the Disclosure Statement contains inadequate information regarding the potential oil and gas royalties. The UST also contends that the Plan does not include any estimates or projections of the Debtor's disposable income over the life of the Plan. Although the UST points out that the success of the Plan rests on oil and gas royalties, he does not oppose the Disclosure Statement based on the Plan's alleged lack of feasibility.

6. The Court held three (3) evidentiary hearings on the Disclosure Statement, including the November Hearing. The other two hearings were held on May 12, 2015 (the "May Hearing") and on August 12, 2015 (the "August Hearing"). Before the May Hearing, Geno announced that the Debtor had resolved some of the issues raised by Trustmark and the

UST. As a result, the Debtor had agreed to amend the Disclosure Statement to include estimates of administrative expenses and projected disposable income. The Debtor also agreed to include a statement that he is unaware of any non-bankruptcy litigation or avoidance actions. With respect to Trustmark's claims, the Debtor agreed to remove any reference to restructuring the debt secured by SCP's two strip malls.[3] Finally, at the UST's request, the Debtor agreed to include language that, if the Bankruptcy Case is closed before a discharge, the Debtor will be required to move to reopen it to request a discharge.

7. The Debtor elicited expert testimony at all three hearings. At the May Hearing, the Debtor offered the testimony of James Herbert Rawls ("Rawls"), the owner of Rawls Resources Inc. Rawls was accepted as an expert in investment and exploration of oil and gas wells, especially with respect to the Glancy Structure (or the Glancy Field) in Copiah County, Mississippi. At the August Hearing and the November Hearing, the Debtor offered the testimony of Steven Scott Walkinshaw ("Walkinshaw"), the owner of Vision Exploration LLC ("Vision"). Walkinshaw was accepted as an expert in petroleum geology.

8. Rawls testified that he invests in oil and gas "deals" and raises funds "to get wells drilled." (Dkt. 185-1 at 8). He is familiar with the Debtor and his family's oil and gas interests in the Glancy Structure, one of the largest salt-based structures in Mississippi. The land owned by the Debtor and his family sits on the top of the Glancy Structure. According to Rawls, it is well known that the Glancy Structure contains oil and gas.

9. Rawls testified that in the mid-1990s, the Debtor and his family leased their land to Anadarko Petroleum Company ("Anadarko"), which had planned to drill a natural gas well on

---

[3] The day after the May Hearing, SCP filed a chapter 11 petition for relief in Case No. 15-01560-NPO.

the Glancy Structure.    According to Rawls, Anadarko abandoned the lease in 2008 when natural gas prices "collapsed."    (Dkt. 185-1 at 9).

10.    Rawls and Walkinshaw entered into a new lease with the Debtor and his spouse (the "Sanders Lease") (Dkt. 185-3) on December 1, 2008.    The primary term of the Sanders Lease expired on October 1, 2012, but the term continues so long as certain operations are conducted at Glancy Field every ninety (90) days.

11.    Since 2010, Rawls and Walkinshaw have either drilled or re-drilled three wells in the Glancy Field pursuant to the Sanders Lease:    (1) the Will-Drill or Sanders 8-2 well (the "Will-Drill Well"), (2) the Venture or Sanders 8-8 well (the "Venture Well"), and (3) the natural gas or Sanders 8-1 well (the "Gas Well").    Rawls testified that he did not expect to drill any other wells in the Glancy Field unless oil prices improved.

12.    The Will-Drill Well was drilled in 2010 at an expense of about $12 million, including the cost of a nine (9) mile pipeline.    Although the Will-Drill Well produced "some of the most expensive oil you'll ever see," it developed mechanical problems and was never brought on-line.    (Dkt. 185-1 at 10).

13.    The Venture Well was drilled about 1,300 feet away from the Will-Drill Well in 2013.    As of the May Hearing, the Venture Well was producing about twenty (20) barrels of oil a day, not a commercially viable rate of production.    Rawls testified that efforts were being made to stimulate oil production.    He could not provide a date when the Venture Well might become commercially viable.

14.    The Gas Well was drilled in the 1970s, and then plugged.    Andarko re-entered the Gas Well in 2000, only to abandon it when the price of natural gas fell in 2008.    Rawls and

Walkinshaw then re-entered the Gas Well in 2010. As of the May Hearing, the Gas Well had been producing natural gas for about one (1) week, and Rawls testified that he intended to contact Texas Eastern that same day to negotiate a natural gas contract. Rawls predicted an income of $4,500.00 a day from the Gas Well. He indicated that the royalty owners would receive thirteenth-sixteenths of that amount within thirty (30) to forty-five (45) days, but he did not know the amount the Debtor would receive.

15. Rawls testified that he would be better able to predict the performance of all three wells in the Glancy Field in ninety (90) days. Based on his testimony, the Court reset the May Hearing to allow the Debtor additional time to present more information regarding the exploration and development of the Glancy Field.

16. At the August Hearing, Walkinshaw testified that he believed the Glancy Field was capable of producing 300-500 barrels of oil a day. At that time, however, neither the Venture Well nor the Will-Drill Well was on-line, and the Gas Well had been plugged. With respect to the Venture Well, Walkinshaw testified that they were unable to augment production to a profitable level and that their attempts to do so had damaged the reservoir. For that reason, they had returned their focus to the Will-Drill Well. They currently were trying to persuade new investors either to redrill or sidetrack the Will-Drill Well. Finally, Walkinshaw testified that the Gas Well had been plugged because of low gas prices.

17. Sanders testified that if the Glancy Field yielded 200 barrels of oil, his share would amount to $6,000.00 per month.

18. At the end of the August Hearing, the Court ordered the Debtor to file an amended disclosure statement with additional information addressing: "the current status of the

Debtor's oil and gas interests in Copiah County, Mississippi regarding the viability of those oil and gas assets and projects, time frames for development of the oil and gas interests and oil and gas projects and potential income therefrom." (Dkt. 153). The Court then reset the August Hearing for November 10, 2015.

19.  Rather than amending the Disclosure Statement, the Debtor filed the Addendum to which he attached a letter from Walkinshaw to the Debtor (the "Letter") dated September 9, 2015. Walkinshaw explained that Vision had received a verbal commitment from PDP Management Group, LLC ("PDP") "to farm in the leasehold interests" in the Glancy Field, with plans to drill a new "test" well near the Will-Drill Well. No contract had been signed, but Walkinshaw wrote in the Letter that Vision and PDP are "moving expeditiously" to close the agreement.

20.  In its Objection to Addendum, Trustmark maintains that the Disclosure Statement should not be approved because the Plan has no reasonable probability of success and cannot possibly be confirmed. Trustmark points out that none of the three wells at the Glancy Field has generated any royalties for the Debtor within the past ten (10) years. Oil prices have fallen since the May Hearing. For the Plan to succeed, however, oil prices must rise, new investors must be found, oil must be discovered and extracted, and the rate of oil production must reach an historic level. In the Objection, Trustmark also asks the Court to convert the Bankruptcy Case to a chapter 7 case.[4]

21.  At the November Hearing, the Debtor elicited Walkinshaw's testimony to update the information provided in the Addendum. Walkinshaw testified that Particle Drilling

---

[4] No written motion to convert the Bankruptcy Case to a case under chapter 7 has been filed. *See* 11 U.S.C. § 1112(b).

Technologies, Inc., through its affiliate, PDP, had expressed an interest in drilling a well at the Glancy Field in order to showcase its new technology. PDP wanted to create a program of wells that included the Glancy Field but intended to drill elsewhere before turning to the Glancy Structure. Walkinshaw testified that he had little negotiating room to push PDP to act more quickly. He could not say if or when the Debtor would receive royalties.

22.     The Debtor testified at the November Hearing that the oil and gas revenues would be used to pay unsecured claims, including Trustmark's unsecured deficiency claim. He also testified that his wife would fund the Plan "if [the] infusion [of cash] would result in a desirable outcome for me."[5]

23.     Gretchen Ware, a real estate manager at Trustmark, testified regarding Trustmark's claims in the Bankruptcy Case at the November Hearing. She testified that Trustmark has a substantial unsecured claim and confirmed that Trustmark does not have a lien on the Debtor's mineral interests.

## Discussion

A disclosure statement is the primary source of information creditors and other parties in interest rely on in making informed decisions about a debtor's plan of reorganization. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988). The purpose of a hearing on a disclosure statement is to determine whether that statement contains "adequate information." 11 U.S.C. § 1125(b). The Code defines "adequate information" as information of a kind, and in sufficient detail, given the nature and history of the debtor and the condition of the debtor's financial records, that will enable the debtor's creditors

---

[5] Test. of Debtor at 10:46:50. Because the Debtor's testimony at the November Hearing was not transcribed, it is cited by the timestamp of the audio recording.

and investors to make an informed judgment about the plan. 11 U.S.C. § 1125(a)(1). A determination of what constitutes adequate information is made on a case-by-case basis under the facts and circumstances presented. *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (citing *Tex. Extrusion Corp.*, 844 F.2d at 1157). Generally, the disclosure statement should contain "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981).

Courts have developed a list of the type of information that should be included in a disclosure statement, including: (1) the circumstances that led to the filing of the bankruptcy petition; (2) a complete description of the available assets and their value; (3) the anticipated future of the debtor; (4) the source of the information provided in the disclosure statement; (5) a disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement; (6) the condition and performance of the debtor while in chapter 11; (7) the claims against the estate; (8) a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7; (9) the accounting and valuation methods used to produce the financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) a summary of the chapter 11 plan of reorganization; (12) an estimate of all administrative expenses, including attorneys' fees and accountants' fees; (13) the collectability of any accounts receivable; (14) any financial information, valuations, or projections relevant to the creditors' decision to accept or reject the plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected value from the recovery of preferential or

otherwise voidable transfers; (17) the existence, likelihood, and possible success of non-bankruptcy litigation; (18) the plan's tax consequences; and (19) the relationship of the debtor with affiliates. *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *In re William F. Gable Co*., 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981). A disclosure statement does not have to include all of the above-listed information to be deemed adequate. *Metrocraft*, 39 B.R. at 568. Conversely, a disclosure statement that includes all of the above-listed information may nevertheless be deemed inadequate. *See In re Phoenix Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001). ("It is . . . well understood that certain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case."). The list is merely a starting point to aid the Court in determining the adequacy of the information provided. *Metrocraft*, 39 B.R. at 568.

With these guidelines in mind, the Court concludes that the Disclosure Statement, as modified by the Addendum and subject to further modification, should constitute adequate information to enable a reasonable creditor and other interested parties to make an informed judgment about the Plan. The further modification must include the following information: (1) the contract negotiations with PDP; (2) PDP's new drilling technology; (3) the anticipated time frame for drilling a new well in the Glancy Field, together with the status of the outstanding mineral leases; (4) financial contributions to the Plan by the Debtor's spouse; and (5) updated financial information as provided at the November Hearing, which should be supplemented by more recent events. The Court will allow the Debtor to submit, without further notice and hearing, an amended disclosure statement that incorporates the information contained in the Addendum and the information outlined above. The Court finds that the Disclosure Statement,

once amended, will contain adequate information to enable creditors to assess the proposed Plan in light of the particular circumstances of this Bankruptcy Case.

As Rawls explained at the May Hearing, the oil and gas business operates in a "high risk" environment, and a large percentage of oil wells will fail. The Court will not doom the Debtor's reorganization at this stage merely because of the multiple variables that influence investments in oil and gas, including the volatility of oil and gas prices. Instead, the Court will allow the Debtor another opportunity to provide creditors and other parties in interest with adequate information as defined in § 1125(a)(1). The Court recognizes that the additional information will not result in a perfect Disclosure Statement, but a "disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances." *In re Price Funeral Home*, No. 08-04816-8-ATS, 2008 WL 5225845, at *2 (Bankr. E.D.N.C. Dec. 12, 2008). Moreover, "no plan proponent is expected to be able to predict the future with unerring accuracy." *In re Stanley Hotel, Inc.*, 13 B.R. at 929.

Trustmark maintains that the Court should deny approval of the Disclosure Statement and convert the Bankruptcy Case to a chapter 7 case because the proposed Plan lacks feasibility under § 1129. As Trustmark points out, it is well settled that a bankruptcy court may disapprove a disclosure statement, even if it contains adequate information, if there is a defect that renders a proposed plan "inherently or patently unconfirmable." *Id. (citing In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996)). Here, however, the Court does not consider the Debtor's Plan to be so "fatally flawed" as to render confirmation impossible. *In re Phoenix Petroleum*, 278 B.R. at 394. Whether the Plan is feasible is an issue for the plan-confirmation hearing. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir.

2012).

IT IS, THEREFORE, ORDERED that the Disclosure Statement is approved subject to the modifications outlined herein.

IT IS FURTHER ORDERED that the Debtor shall amend the Disclosure Statement consistent with this Order within fourteen (14) days of this Order.

##END OF ORDER##